503 So.2d 159 (1987)
UNION TEXAS PETROLEUM CORP.
v.
MID LOUISIANA GAS COMPANY.
No. CA-5874.
Court of Appeal of Louisiana, Fourth Circuit.
February 12, 1987.
Rehearing Denied March 19, 1987.
Writ Denied May 29, 1987.
*160 John M. Wilson, Joe B. Norman, Liskow & Lewis, New Orleans, for plaintiff.
Edward H. Bergin, Alan C. Wolf, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for defendant.
Before GULOTTA, GARRISON and PRESTON H. HUFFT, Pro Tem.
GULOTTA, Judge.
In this dispute involving the sale of natural gas, the defendant-purchaser appeals from a judgment ordering it to pay prices as determined by the court for a fifteen month period, subject to a credit for amounts previously tendered. Because we conclude that the purchaser has already paid the seller the proper prices, we reverse and set aside the judgment.
The facts are largely stipulated. Union Texas Petroleum Corporation (Union Texas) was one of five owners of the natural gas produced from the Roland C. Kizer Well No. 1 in the Irene Field in East Baton Rouge Parish. South Louisiana Production Company, Inc. (SLAPCO), a co-owner, operated the well. By a letter agreement of August 17, 1978, all five of the working interest owners agreed to sell the gas to Mid Louisiana Gas Company (Mid Louisiana) at a specified price regulated by the Natural Gas Act.
Because the Natural Gas Policy Act of 1978 would eventually deregulate the price of the gas from the Kizer well, the parties amended their letter agreement on October *161 27, 1978 to provide for new gas pricing provisions. According to this amendment, the gas deliveries until December 11, 1978 were to be governed by the previous letter agreement. The price for gas delivered from December 11, 1978 until December 11, 1979 was to be the "Section 102" price specified in the Natural Gas Policy Act of 1978. Paragraph 4(c) of the October 27 letter agreement further provided, however, that the price of gas delivered after December 11, 1979 would be calculated at a future date as follows:
"(c) For the period commencing 7:00 A.M., Central Standard Time, December 11, 1979, and continuing until 7:00 A.M., March 1, 1981, Mid Louisiana shall pay Seller for all gas delivered hereunder, a price equal to the average price paid to Seller (or their successors or assigns) for gas produced from all other wells in the field in which the aforesaid Roland C. Kizer No. 1 Well is completed. Said price shall be calculated based on the price paid or payable (including any escalations and adjustments thereto) for the period commencing December 11, 1979 and ending March 1, 1981, and shall be calculated no later than December 31, 1979, such price being hereinafter referred to as the "Calculated Price." Provided, however, that if Mid Louisiana should, in its sole discretion, by February 11, 1980, determine that the Calculated Price is unacceptable, Mid Louisiana shall not be obligated to pay the Calculated Price, but instead shall pay for the gas delivered during the period commencing December 11, 1979 and ending March 1, 1981, the price calculated under Section 102 of the Natural Gas Policy Act of 1978, applicable from time to time. Provided further, however, that should Mic Louisiana advise Seller that the Calculated Price is unacceptable, any party Seller may elect to terminate this Agreement, as to such Seller's interest, at any time after February 11, 1980 by giving written notice thereof and specifying the date of termination. Similarly, the computations of the Calculated Price and the Section 102 price, and the right to the options provided in this Paragraph 4(c) shall be successively applicable for each year this Letter Agreement is continued beyond March 1, 1981."
When the parties entered into the amending letter agreement on October 27, 1978, the Kizer well was the only one producing and delivering gas in the Irene Field. Several other wells were being drilled, however, and the parties contemplated that those wells would be producing gas by late 1979 so that the "average price paid or payable" to the sellers from those other wells in the Irene Field could be used to determine the "calculated price" payable by Mid Louisiana under Paragraph 4(c) for Kizer well gas after December 11, 1979.
On January 4, 1980, after a postponement agreeable to all the parties, George S. Phillips, the agent for SLAPCO, met with officers of Mid Louisiana to determine the calculated price under Paragraph 4(c) for the remaining term of the contract. At the time of this meeting, however, the Kizer well was still the only well producing gas in the Irene Field, though SLAPCO had recently entered into proposed agreements with two other companies, Transco and Texas Gas, to sell gas from another well in the Irene Field that was expected to produce and deliver gas within the near future. Phillips suggested, therefore, that the "calculated price" of gas from the Kizer well from December 11, 1979 until March 1,1981 could be based on the pricing provisions set forth in the Transco and Texas Gas agreements.
Mid Louisiana objected to Phillips's proposal on several grounds. Specifically, Mid Louisiana felt that the pricing in the Transco and Texas Gas agreements could not be used as a calculated price under the October 27 letter agreement because no gas was currently flowing from those wells and no price had yet been paid to SLAPCO. Mid Louisiana also felt that the proposed Transco and Texas gas prices were too high since they were based on fifteen year contracts and not applicable to Mid Louisiana's short term contract with the owners that was scheduled to end in less than two years.
*162 After failing to agree with Phillips on a calculated price, Mid Louisiana's president, Vernon Woods, proposed a new 15 year contract whereby Mid Louisiana would purchase gas from the Kizer well at the interim rate of $2.75 per million British Thermal Units (MMBTU) from December 11, 1979, until such time that gas flowed under the SLAPCO/Transco and SLAPCO/Texas Gas agreements. Thereafter, for the duration of the new 15 year contract, Mid Louisiana would buy Kizer well gas at the identical provisions as set forth in those other two contracts. Mid Louisiana emphasized that these proposed prices under this substitute contract were dependent on the owners' commitment of the Kizer well gas for a fifteen year term rather than simply until March, 1981.
On behalf of SLAPCO, Phillips agreed to Mid Louisiana's proposal of a 15 year contract, but made it clear that he could not speak for the other non-operating owners or execute an agreement on their behalf. Phillips was to convey Mid Louisiana's proposed contract to the other sellers for their consideration as he had done in the past.
After the January 4 meeting, Phillips contacted the other sellers and all of them agreed to the substitute 15 year contract, except Union Texas. E.I. Cerchie, Union Texas's general manager, expressed concern that his company was contractually committed to sell its share of gas from the Kizer Well to another party after March 1, 1981. Cerchie asked, however, that Mid Louisiana submit a formal proposal for Union Texas's formal response. Around January 10,1980, Phillips telephoned Mid Louisiana and related Union Texas's response and request.
After hearing from Phillips, Mid Louisiana began paying all sellers, including Union Texas, for Kizer well gas at the interim rate of $2.75 per MMBTU for the month of December, 1979. This new rate was higher than the "Section 102" rate of $2.35 per MMBTU that Mid Louisiana had been paying. Mid Louisiana continued paying at increased rates from January through mid-April, 1980, in expectation that all the sellers would sign the new fifteen year contract.
In April, 1980, SLAPCO began to deliver gas from another well in the Irene Field to Transco and Texas Gas under written contracts. Mid Louisiana thereafter submitted its formal 15 year contract for Kizer well gas to all the owners, including Union Texas. Four of them signed, but Union Texas advised Mid Louisiana on May 5, 1980 that it was unable to accept the long term contract because it had previously contracted to sell its share of the Kizer gas to another party after March 1, 1981, when the current contract was due to terminate.
Mid Louisiana consequently informed Union Texas that it would recoup $90,600.38 in interim payments previously paid for the period from December 11, 1979 through April 30, 1980, that were in excess of the Section 102 price. Under the circumstances, Mid Louisiana felt that since it had rejected the calculated price suggested by Phillips at the January 4 meeting, it was entitled to pay instead the Section 102 price pursuant to Paragraph 4(c) of the October 27 letter agreement which remained as the contract between Mid Louisiana and Union Texas. Subsequently, Union Texas continued under protest to deliver its share of gas from the Kizer well, and Mid Louisiana continued to accept it until the October 27 letter agreement expired by its own terms on March 1, 1981.
After the parties failed to resolve their differences amicably, Union Texas filed suit against Mid Louisiana for an accounting and a determination of the proper calculated price due for the Kizer gas from December 11, 1979 until March 1, 1981. The matter was submitted to a commissioner based on stipulated facts and the depositions of Phillips and the corporate officers involved. Additionally, the commissioner heard the testimony of two experts on the market value of natural gas.
In his written report, the commissioner concluded that Paragraph 4(c) of the October 27 letter agreement required the parties to determine the calculated price before Mid Louisiana could reject it as unacceptable and pay only the Section 102 price. *163 According to the commissioner, nothing in the letter agreement gave Mid Louisiana the right to limit its liability to the lower Section 102 price if the parties simply were unable to agree on the threshold basis for determining the calculated price.
The commissioner noted that at the January 4, 1980 meeting SLAPCO had presented two other agreements with Transco and Texas Gas that should have been used as a basis for determing the calculated price even though gas was not then flowing from any other well in the Irene field except the Kizer well. The commissioner found that the parties had failed to determine a calculated price on January 4 because Mid Louisiana had proposed an entirely new 15 year agreement to replace the October 27 letter agreement. The commissioner therefore concluded that Union Texas was entitled to recover from Mid Louisiana the difference between the prices actually paid by Mid Louisiana (after the recoupment) and the proper calculated prices based upon the SLAPCO/Transco and SLAPCO/Texas Gas agreements.
The trial judge adopted the commissioner's report as his reasons for judgment and ordered Mid Louisiana to pay Union Texas for its share of the Kizer well gas at the price set forth in those two contracts, less a credit for amounts previously paid from December 11, 1979 until March 1, 1981. It is from this judgment that Mid Louisiana has appealed.
According to Mid Louisiana, Paragraph 4(c) explicity gives it, as purchaser, the "sole discretion" to decide whether a "calculated price" proposed by the sellers is unacceptable. Mid Louisiana points out that during the meeting with the seller's negotiator on January 4, 1980, Mid Louisiana's president firmly and repeatedly rejected the calculated price based on SLAPCO's proposed contracts with Transco and Texas Gas before advancing Mid Louisiana's counter proposal of a 15 year contract. Although it began paying a higher rate to all the sellers in anticipation that they would enter into the new long term contract, Mid Louisiana argues that under the provisions of Section 4(c) it had the right to recoup the excess price paid above the Section 102 rate as "payment of a thing not due" and to resort to paying the Section 102 price for the remainder of the contract after Union Texas rejected the new contract. We agree.
Paragraph 4(c) of the October 27 letter agreement defines the "calculated price" for all gas from the Kizer well delivered after December 11, 1979 as "the average price paid to seller ... for gas produced from all other wells in the [Irene Field]". It is to be calculated based on such price "paid or payable" for the relevant period. The agreement further provides that if Mid Louisiana "in its sole discretion" determines that the calculated price is "unacceptable" by February 11, 1980, it shall not be obligated to pay the calculated price but instead shall pay the price calculated under Section 102 of the Natural Gas Policy Act of 1978. If Mid Louisiana so advises the sellers that the calculated price is unacceptable, a seller may give written notice that it is electing to terminate the agreement, (insofar as its interest) at any time after February 11, 1980.
Contracts are interpreted to determine the common intent of the parties. LSA-C.C. Art. 2045. When the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. LSA-C.C. Art. 2046. When the parties make no provision for a particular situation, however, it is assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose. LSA-C.C. Art. 2054.
Applying these rules of construction to the clear provisions of Paragraph 4(c), we conclude that Mid Louisiana fully complied with the wording of the letter agreement of October 27,1979. Through its actions at the January 4, 1980 meeting, Mid Louisiana exercised its sole discretion to determine that the calculated price set forth by SLAPCO was unacceptable and duly advised the *164 owners through the operator's negotiator, George Phillips.
The stated purpose of the January 4 meeting was to determine the calculated price under Paragraph 4(c). Phillips, the negotiator for the sellers, testified in deposition that the owners of the well had the obligation of coming forward with a calculated price at the end of 1979. Before the January 4 meeting, Phillips had told Cerchie, the general manager of Union Texas, that he was going to try to get the prices in SLAPCO's letters of intent with Transco and Texas Gas incorporated as the "calculated price" for the remainder of the term of the Kizer well contract with Mid Louisiana.
Phillips, as the representative of SLAPCO and liaison for the non-operating owners, opened the January 4 meeting by proposing a "calculated price" based on SLAPCO's proposed agreements with Transco and Texas Gas. After examining the proposal, Vernon Woods of Mid Louisiana unequivocally rejected Phillips's proposal and articulated a number of reasons for doing so. Whatever phraseology is used to describe the situation, it is clear that Phillips offered a calculated price at the January 4 meeting and Mid Louisiana, in its sole discretion, rejected it as unacceptable. The trial court fell into error when it concluded that no calculated price had been determined in the negotiations.
The trial court further erred in concluding that Mid Louisiana had circumvented the October 27 letter agreement and had never permitted a price to be calculated by submitting its counter-proposal of a 15 year contract. To require Mid Louisiana to withhold its counter-offer while the sellers went through the vain and useless gesture of calculating a price that Mid Louisiana had already rejected, would serve no purpose and would defeat the intent of the parties.
Mid Louisiana likewise complied with the additional requirement of Paragraph 4(c) of the October 27 letter agreement by advising the owners, through Phillips, that it had rejected proposed calculated price based on the Transco and Texas Gas agreements as unacceptable. In keeping with the prior course of dealing among the parties in this particular case, Phillips, as agent for the operating owner, negotiated with Mid Louisiana and communicated the substance of these negotiations to the other non-operating owners of the Kizer well. After the January 4 meeting, Phillips telephoned Cerchie of Union Texas and told him of Mid Louisiana's offer to purchase gas from the Kizer well on a fifteen year basis and to pay an interim price of $2.75 (which was higher than the prevailing Section 102 price of $2.35), contingent on a long term contract. Although stating that the 15 year term was unacceptable, Cherchie responded ambiguously by asking to see a copy of Mid Louisiana's written proposal before giving a formal response.
In anticipation that all the owners would sign a fifteen year contract, Mid Louisiana began paying the $2.75 per MMBTU price during the interim from December 11, 1979 until gas from the other well in the Irene Field began to be delivered to Transco and Texas Gas. Cerchie himself acknowledged in his deposition that it is a normal occurrence in the oil business for a party, who believes that it has an agreement, to pay a higher price pending the signing of a formal contract.
Once Union Texas formally rejected the Mid Louisiana's written 15 year contract on May 4, 1980, Mid Louisiana ceased making the increased payments to Union Texas, recouped the overpayment, and reverted to the Section 102 price retroactively to December 11, 1979, all in accord with the explicit provisions of Paragraph 4(c), which provide that Mid Louisiana may pay the Section 102 price instead of the "calculated price" after determining that the calculated price is unacceptable.
The trial court's reasoning forces Mid Louisiana to accept a calculated price based on the Transco and Texas Gas agreement and ignores Mid Louisiana's obvious intent to reject those agreements as the calculated price. Furthermore, by awarding Union Texas damages in the amount of the prices SLAPCO's agreements with Transco and Texas Gas, the trial court's judgment compels *165 Mid Louisiana to pay Union Texas, a short term seller, for Kizer well gas for the period of December 11, 1979 through March 1, 1981 at prices higher than those paid to the owners who signed the fifteen year agreement. The effect of the trial court's judgment is to give Union Texas a windfall in the form of higher prices under a long term contract that it never signed. This result is unfair to Mid Louisiana and contrary to the Paragraph 4(c), which is the law between the parties in this case. See LSA-C.C. Art. 1983. Until the owners entered into new long term contracts with Mid Louisiana, Paragraph 4(c) still governed their relationship and Mid Louisiana was entitled to pay the Section 102 price if the new contract did not come into existence.
In so holding, we reject Union Texas's alternative arguments that it is entitled to recover on theories of implied contract or quantum meruit if this court rejects the trial court's interpretation of Paragraph 4(c). According to Union Texas, Mid Louisiana's payment for gas after December 11, 1979 at higher rates constitutes a course of conduct that established an implied contract to pay more than the Section 102 price or else created a quasi-contractual obligation to pay Union Texas at the market rate rather than the Section 102 price.
An implied in fact contract rests upon consent implied from facts and circumstances showing a mutual intention to contract. V-8 Taxi Cab Service, Inc. v. Hayes, 322 So.2d 442 (La.App. 4th Cir. 1975). Consent to an obligation may be implied from action only when circumstances unequivocally indicate an agreement or when the law presumes it. Bergeron v. Munsch, 471 So.2d 302 (La.App. 4th Cir. 1985). Furthermore, there can be no implied contract where there is an express contract between the same parties in reference to the same subject matter. Mazureau v. Hennen, 25 La.Ann. 281 (La.1873).
In the instant case, there was no mutual assent between Mid Louisiana and Union Texas to an implied in fact contract. Mid Louisiana's payment of the interim rate of $2.75 per MMBTU following the January 4, 1980 meeting was contingent on Union Texas's signing of the proposed fifteen year long term contract. On the other hand, Cerchie of Union Texas testified in deposition that he had assumed that the increase in price paid for the gas by Mid Louisiana was the "calculated price" that everyone else was receiving under Paragraph 4(c), and he had not learned that Mid Louisiana had been paying the higher price on condition that the sellers would execute a long term contract until he received a written proposal for the 15 year contract in April, 1980. Under these circumstances, it is clear that the actions of Mid Louisiana and Union Texas did not manifest a mutual assent between them to create an implied contract. Furthermore, Paragraph 4(c) still remained in effect between the parties until the new 15 year contract was signed. Because an express contract existed, there was no implied contract on the same subject matter.
Similarly, it is well settled that recovery on a theory of quantum meruit or unjust enrichment is permitted only in the absence of a contract. See Creely v. Leisure Living, Inc., 437 So.2d 816 (La.1983); Miller v. Housing Authority of New Orleans, On Rehearing, 249 La. 623, 190 So.2d 75 (1966); Southern Mercantile v. Gulf South Catalyst, 471 So.2d 728 (La. App. 1st Cir.1975). In the instant case, because Paragraph 4(c) of the October 27, 1979 letter agreement remained as the contract between the parties, neither quantum meruit nor any other quasi-contractual remedy applies in this case.
Accordingly, the judgment of the trial court is reversed and set aside. Judgment is now rendered dismissing plaintiff's suit at its cost.
REVERSED AND RENDERED.